**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ASHLEY DONNELLY,** | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION** |
| **v.** | : | **No. 20-4189** |
| | : | |
| **CAPITAL VISION SERVICES, LLC** | : | |
| **Defendant.** | : | |

**McHUGH, J.**                                                    **December 6, 2022**

## <u>MEMORANDUM</u>

This is an employment discrimination case that raises multiple claims arising out of Plaintiff Ashley Donnelly's pregnancy and maternity leave, after she was terminated from a position at an optometrist's office soon after she returned to work. The majority of her claims lack merit. But Plaintiff's strong performance as an employee, coupled with certain statements and conduct directed toward her after she announced her pregnancy, support an inference of discrimination worthy of the attention of a jury. Consequently, I will grant Defendant's pending motion for summary judgment in part but allow Plaintiff's claims of pregnancy discrimination under Title VII and the Pennsylvania Human Relations Act ("PHRA") to proceed to trial.

### I.      Relevant Background

Plaintiff Ashley Donnelly brings claims for pregnancy discrimination and retaliation under Title VII, 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the PHRA, 43 P.S. § 951 *et seq.*;[1] a claim for experiencing a hostile work

---

[1] Donnelly has pleaded exhaustion of PHRA administrative remedies in her Second Amended Complaint, ECF 36 at ¶ 17, and CVS does not dispute this fact. *See* 43 P.S. § 962(c); *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001).

environment under Title VII; and a claim for interference with her rights under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and retaliation for exercising her FMLA rights. Pl.'s Second Am. Compl., ECF 36 at ¶¶ 37-64.

Defendant Capital Vision Services, LLC ("CVS") provides management, billing, supply, and other services to independently owned "MyEyeDr." eye care practices in the eastern and central United States. Hollis Aff., ECF 63-11 at ¶ 4. As part of these services, CVS handles employment matters at the eye care practices. *Id.*

Plaintiff was employed at the MyEyeDr. location on Pheasant Run Road in Newtown, PA, as an Optometric Technician from March 2019 to June 2020. Donnelly Dep., ECF 68-3 at 28:3-5. Her responsibilities included greeting patients, reviewing their medical history, and conducting initial screenings. Gilroy Dep., ECF 68-6 at 38:14-21. Prior to her employment, Donnelly worked at other eye doctors' offices in similar roles, and as such "didn't have to come in at ground zero." *Id.* at 37:19-22. Donnelly was supervised by the Office Manager, Linda Gilroy, and Dr. David Duffy, who supervised most of Donnelly's day-to-day duties. *Id.* at 24:1-9; Donnelly Dep., ECF 68-4 at 288:7-22. Donnelly also worked as a transcriber for Dr. David Schwartz, the other doctor in the office. Schwartz Dep., ECF 68-8 at 21:6-15.

Donnelly's job performance was highly rated, with Gilroy describing it as "excellent." Gilroy Dep., ECF 68-6 at 42:12-15. Donnelly never received any formal discipline from CVS, and Dr. Schwartz never complained to Gilroy about Donnelly's performance. Donnelly Dep., ECF 68-3 at 31:1-14; Gilroy Dep., ECF 68-6 at 43:24-44:22. Donnelly admits, however, that she sometimes disagreed with co-workers when she was asked to take on tasks outside of her typical job duties, such as working the front desk. Donnelly Dep., ECF 68-3 at 64:6-67:12.

Shortly after Donnelly started, CVS hired another Optometric Technician at the Pheasant Run location – Shemiah King.  *Id.* at 61:21-62:4.  King was later retained when Donnelly was discharged.  Donnelly helped train King, and Gilroy acknowledged that Plaintiff did a "good job" training her.  Gilroy Dep., ECF 68-6 at 141:6-8.  King had issues arriving late to work and with her performance, but she got along with her co-workers, received positive feedback from her supervisors, and received no written discipline.  *Id.* at 141:9-142:19.  But in comparing King and Donnelly's performance and experience, however, Gilroy testified that Donnelly was "heads above" King.  *Id.* at 59:11-20.

Donnelly did not have a perfect working relationship with Dr. Duffy, but initially their relationship was positive and supportive.  Donnelly Dep., ECF 68-4 at 343:19-20.  Before her pregnancy, Dr. Duffy encouraged Donnelly to seek out more advanced positions at the company, such as a position where she would train technicians across the company's stores.  *Id.* at 39:22-40:22.  During Donnelly's pregnancy, however, her working relationship with Dr. Duffy deteriorated.  *Id.* at 48:20-49:5.  To Donnelly, Dr. Duffy appeared visibly unhappy when she announced her pregnancy and implied a belief that Donnelly would not be able to resume work after giving birth, asking other staff whether Donnelly's boyfriend would financially support her.  *Id.*; Gilroy Dep., ECF 68-6 at 66:10-66:21.

Donnelly testified that Dr. Duffy also pressured her to take on extra transcribing duties later in her pregnancy, which Donnelly was unhappy about because she felt "overwhelmed" by her existing duties.  Donnelly Dep., ECF 68-3 at 45:23-47:7.  Gilroy (the office manager) felt that it was unfair that Dr. Duffy would do this, because Donnelly was "very pregnant" at the time and was hired to scribe for Dr. Schwartz, not Dr. Duffy.  Gilroy Dep., ECF 68-6 at 46:9-17.

Around November 2019, Donnelly spoke to Gilroy and human resources about requesting maternity leave.  Donnelly Dep., ECF 68-3 at 134:9-16, 169:13-170:4.  Thereafter, Donnelly contacted Cigna, CVS' leave administrator.  *Id.* at 122:12-19.  Cigna determined that Donnelly would be eligible for FMLA leave from March 5, 2020 through March 22, 2020, but denied paid leave before March 5 because Donnelly was not eligible for disability leave and was not eligible for FMLA before completing one year of employment.  *Id.* at 122:24-123:4, 197:6-20.  Donnelly started her leave on February 5, 2020 and gave birth to her son on February 10, 2020.  *Id.* at 102:11-14.  She admits that no one prevented her from taking her maternity leave.  *Id.* at 137:24-139:10.  At the end of her leave on March 23, 2020, Donnelly was ready to return to work and had no post-pregnancy complications that would have prevented her from working.  *Id.* at 125:24-126:11.

Meanwhile, due to the Covid-19 pandemic and related government restrictions, CVS temporarily closed all stores on March 21, 2020, including the Pheasant Run office.  *Id.* at 222:11-223:5.  CVS furloughed all employees but announced that any "active" employee would receive two weeks of special Covid-19 pay starting March 23, 2020.  *Id.* at 176:9-12; Gilroy Dep., ECF 68-6 at 143:5-11.  Donnelly was returned to active status on March 23, and ultimately received the two weeks of special pay on the same day as other active employees.  Donnelly Dep., ECF 68-3 at 177:10-178:9.  The parties dispute some of the events leading to Donnelly receiving the special pay.  Construing the facts in the light most favorable to Donnelly, however, CVS withheld her Covid-19 pay until she told Brian Pietruszewski, the District Manager, that she may seek legal advice on her situation.  *Id.*

While Donnelly and other employees were still furloughed, CVS decided to conduct several reductions in force due to the financial toll of pandemic restrictions.  Hollis Aff., ECF 63-11 at ¶ 24.  The Regional Director for the Pheasant Run store, Larry Wills, handled termination

decisions within his region. Wills Dep., ECF 68-15 at 39:6-15, 49:9-12. A variety of factors were used to make termination decisions for each office, including seniority, ability to travel, employee abilities and proficiencies, and teamwork and collaboration skills. *Id.* at 53:24-56:11. Nevertheless, Wills mostly relied on input from staff in each office and could not recall an instance where he went against an office's recommendation. *Id.* at 40:2-20. For the Pheasant Run store, Wills relied almost exclusively on conversations with Dr. Duffy to inform his termination decisions. *Id.* at 40:24-48:6.

In June 2020, four months after giving birth and three months after ending maternity leave, Donnelly was terminated by CVS. Donnelly Dep., ECF 68-3 at 17:7-11. CVS retained the other Optometric Technician, Shemiah King, who remained on active status and returned to work at the Pheasant Run location after pandemic restrictions ended. Hollis Aff., ECF 63-11 at ¶ 27.

## II.    Legal Standard

This Motion is governed by the well-established standard for summary judgment set forth in Fed. R. Civ. P. 56(a), as amplified by *Celotex Corporation v. Catrett*, 477 U.S. 317, 322-23 (1986).

## III.    Discussion

CVS moves for summary judgment on all of Donnelly's claims, arguing that all her claims are merely based on "speculation and conjecture." Def.'s Br., ECF 64 at 51. Ms. Donnelly cannot establish a prima facie case of discrimination under the ADA; harassment under Title VII; interference with her FMLA rights; or retaliation for exercising her rights under the ADA, Title VII, the FMLA, and the PHRA. But genuine issues of material fact preclude granting CVS summary judgment on Donnelly's Title VII and PHRA pregnancy discrimination claims.

5

### A.  Pregnancy discrimination under Title VII and the PHRA

Title VII forbids an employer from "discharg[ing] any individual, or otherwise to discriminat[ing] against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's . . . sex."  42 U.S.C. §2000e-2(a)(1).  The Pregnancy Discrimination Act amended Title VII to specifically state that discrimination "because of sex" or "on the basis of sex" includes discrimination "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k).

In the absence of direct evidence of discrimination, the *McDonnell Douglas* burden-shifting analysis applies to discrimination claims brought under Title VII and the PHRA. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973); *Jones v. SEPTA*, 796 F.3d 323, 327 (3d Cir. 2015) (internal citations omitted).  Under *McDonnell Douglas*'s familiar three-step framework, (1) a plaintiff must first establish a prima facie case of discrimination; (2) if she does, the employer must give a legitimate reason for its conduct; and (3) if the employer meets its burden, the plaintiff must show the employer's proffered reason is pretextual.  *Jones*, 796 F.3d at 325-26.

#### 1.  *Donnelly establishes her prima facie case of pregnancy discrimination.*

Within the Third Circuit, to establish a prima facie case of pregnancy-related discrimination under Title VII and the PHRA, a plaintiff must show that (1) "she is or was pregnant and that her employer knew she was pregnant," (2) "she was qualified for her job," (3) "she suffered an adverse employment decision," and (4) "there is some nexus between her pregnancy and her employment termination that would permit a fact-finder to infer unlawful discrimination." *Doe v. C.A.R.S. Prot. Plus, Inc*., 527 F.3d 358, 365 (3d Cir. 2008).

The Third's Circuit's test slightly modifies the traditional analysis under Title VII. That is so because "[p]regnancy, of course, is different [from other protected personal attributes] in that

its obviousness varies, both temporally and as between different affected individuals." *Geraci v. Moody–Tottrup, Int'l, Inc.,* 82 F.3d 578, 581 (3d Cir. 1996). As observed by Judge Brody of this Court, one way in which pregnancy differs is that "it is not immutable. While some effects of pregnancy linger beyond the act of giving birth, at some point the female employee is no longer 'affected by pregnancy, childbirth, or related medical conditions,' for purposes of the PDA." *Solomen v. Redwood Advisory Co.,* 183 F. Supp. 2d 748, 753 (E.D. Pa. 2002) (quoting 42 U.S.C. § 2000e(k)). As a result, courts have generally held that a plaintiff who was not pregnant at or near the time of termination "has some additional burden in making out a prima facie case" of pregnancy discrimination. *Id.* at 754. "Such a showing might consist of evidence that harassment or discriminatory statements by plaintiff's supervisors began during her pregnancy or maternity leave and continued with some regularity until the adverse employment action occurred." *Id.*

Donnelly delivered her son four months prior to her termination and ended maternity leave three months prior to her termination. This leads CVS to argue that Donnelly cannot meet her prima facie case solely based on the gap in time between delivery of her son and her termination. But whether a woman is affected by "pregnancy, childbirth, or related medical conditions" under Title VII is a question best answered on a "case-by-case basis." *Helmes v. S. Colonie Cent. Sch. Dist.*, 564 F. Supp. 2d 137, 147 (N.D.N.Y. 2008); *see also Geraci*, 82 F.3d at 581 (noting that the elements of a prima facie case "must not be applied woodenly, but must rather be tailored flexibly to fit the circumstances of each type of illegal discrimination"). At the very least, a plaintiff who is terminated a few months after giving birth *may* be eligible for membership in the PDA's protected class, depending on the facts of a case. *See Helmes*, 564 F. Supp. 2d at 147 (plaintiff terminated nine weeks after she returned from maternity leave); *Jones v. Hosp. of Univ. of Pa.*, No. CIVA. 03-CV-4938, 2004 WL 1773725, at *3 (E.D. Pa. Aug. 5, 2004) (plaintiff terminated

one week after she returned from maternity leave and two and a half months after delivery); *Quaratino v. Tiffany & Co*., 71 F.3d 58, 62-65 (2d Cir. 1995) (plaintiff terminated four months after giving birth when she attempted to return from maternity leave).

On the record here, even though Donnelly was terminated four months after giving birth, and was no longer on maternity leave, she nonetheless makes a plausible case that her pregnancy is connected to her termination.   During her deposition, Donnelly testified that Dr. Duffy's demeanor towards her changed "instantly" after she was pregnant, and she felt that he was "purposely trying to overwhelm" her.   Donnelly Dep., ECF 68-3 at 48:14-49:5.   Gilroy partly corroborates this allegation, stating in her deposition that Dr. Duffy unfairly started pushing his scribing work on Donnelly while she was pregnant.   Gilroy Dep., ECF 68-6 at 45:18-46:17. Donnelly further testified that Dr. Duffy and Linda Gilroy repeatedly questioned her about her maternity leave and ability to return to work.   Donnelly Dep., ECF 68-3 at 138:8-16.   Dr. Duffy also made at least one comment to Donnelly's co-workers suggesting that she would be unable to balance her job responsibilities with childcare responsibilities after giving birth.   Gilroy Dep., ECF 68-6 at 66:10-66:21.   Even after her return from maternity leave, Donnelly alleges that CVS likely would have withheld her two weeks of Covid-19 pay had she not suggested seeking legal advice. Donnelly Dep., ECF 68-3 at 177:10-178:9.   Three months later, while Donnelly was on furlough until the office could re-open, CVS terminated her.   *Id.* at 17:7-11, 228:10-20.

CVS is correct that "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir.1990).   But Donnelly's claim has evidentiary support: it is based on her capable performance, specific comments that Dr. Duffy made about her pregnancy, Linda Gilroy's persistent inquiries about her return, and Dr. Duffy's purportedly

dramatic change of demeanor after she announced her pregnancy. While these facts are disputed, they are material facts which, construed in a light favorable to Donnelly, establish a nexus between her pregnancy and her termination.

      2. *CVS articulates a legitimate non-discriminatory reason for Donnelly's termination.*

Once a plaintiff has established a *prima facie* case, the burden of production shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *McDonnell Douglas*, 411 U.S. at 802. At this time, the employer must demonstrate "evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." *Fuentes v. Perski*, 32 F.3d 759, 763 (3d Cir. 1994).

CVS has offered ample evidence of a legitimate non-discriminatory reason for the termination. During the reduction-in-force, CVS had to choose between terminating Donnelly or King, so that the Pheasant Run location would still have an optometric technician. Duffy Dep., ECF 68-7 at 93:16-95:16. CVS stresses that, amid the continuing pandemic, a major concern for Dr. Duffy was "unity" among the office staff. *Id.* at 92:18-93:6. Moreover, while no set formula was used to make termination decisions, the criteria used by CVS included "teamwork [and] collaboration level." Wills Dep., ECF 68-15 at 53:24-56:11. CVS alleges that Donnelly's frustration with completing tasks outside of her regular duties, including working the front desk, "added tension to the office environment" and disrupted the work of other employees. Daino Aff., ECF 63-9 at ¶¶ 5, 7. CVS alleges that King, in contrast, "did not create such tension," never complained about working the front desk when necessary, and generally got along well with others. *Id.* ¶ 5; Donnelly Dep., ECF 68-3, at 74:1-16, 212:9-10. This is sufficient to establish a legitimate non-discriminatory reason for Donnelly's termination.

*3.  Donnelly can show that this reasoning is pretext for discrimination.*

If the employer satisfies their burden, the presumption of discriminatory action raised by the prima facie case is rebutted and the burden shifts back to the plaintiff to establish that the employer's legitimate, non-discriminatory reason was merely pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804.  At the summary judgment stage, a plaintiff can establish pretext by pointing "to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  *Fuentes*, 32 F.3d at 764.

Donnelly has offered enough evidence for a reasonable factfinder to disbelieve CVS' reasoning for her termination.  Gilroy explicitly stated in her deposition that Donnelly was an "excellent" employee, and that King had her own workplace issues around attendance and attitude. Gilroy Dep., ECF 68-6 at 42:12-15.  Donnelly also testified about King's "stand-offish" behavior in the office and King's attempts to avoid doing work.  Donnelly Dep., ECF 68-3 at 212:2-214:4. Gilroy also testified that Donnelly was "heads above" King in terms of competence and experience as an optometric technician.  Gilroy Dep., ECF 68-6 at 59:11-20.  A reasonable factfinder could rely on these facts to determine that CVS' proffered reasons for the discharge are pretext for discrimination.

CVS argues that Wills and other directors at CVS were not biased against her in making the termination decision, which was allegedly based on a variety of objective factors.  *See* Def.'s Br., ECF 64 at 14.  But there is ample evidence that Dr. Duffy played a central role in the decision-making.

To establish a causal relationship between the actions of an employee or supervisor and an adverse decision by an unbiased decisionmaker, a plaintiff must show "'some direct relation between the injury asserted and the injurious conduct alleged,'" which goes beyond "links that are 'remote, purely contingent, or indirect.'"  *Jones*, 796 F.3d at 330 (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).  Wills' deposition strongly suggests that Dr. Duffy was able to dictate who would be terminated at Donnelly's store as part of the reduction in force.  *See* Wills Dep., ECF 66-13 at 40:24-48:6.  Wills relied heavily on feedback from staff in each office and could not recall an instance in which he went against an office's recommendation.  *Id.* at 40:2-20.  For the Pheasant Run store, Wills relied on conversations with Dr. Duffy to make termination decisions. *See id.* at 40:24-48:6; Duffy Dep., ECF 68-7 at 91:4-17, 94:11-95:16; Def.'s Br., ECF 64 at 15. While Wills claimed that he collaborated with several members of the leadership team for each location, he never spoke individually with any other individuals involved in overseeing the Pheasant Run office.  *See* Wills Dep., ECF 66-13 at 40:24-48:6.  Plaintiff cogently argues that Duffy was part of a "leadership" team  involved in the decision.  Pl.'s Br., ECF 68 at 31-32.[2] Construing the evidence in a light favorable to Donnelly, this is certainly enough to defeat summary judgment on her pregnancy discrimination claims under Title VII and the PHRA.

---

[2] Plaintiff does not explicitly invoke a "cat's paw" theory of liability, but the arguments advanced are in some respects consistent with it.  Under the "cat's paw" theory of liability, an employer may be liable for employment discrimination if the source of illegal animus was not the final employment decision-maker but rather another employee or supervisor whose animus proximately caused the adverse employment action at issue in the case.  *McKenna v. City of Philadelphia*, 649 F.3d 171, 178 (3d Cir. 2011).  While the cat's paw analysis does not fit neatly into the *McDonnell Douglas* framework, because it had its origin in mixed motive cases, many courts choose to apply it in analyzing pretext. *See Afrasiabipour v. Pa. Dep't of Transp.*, 469 F. Supp. 3d 372, 386 (E.D. Pa. 2020) (surveying cases).

**B.  Harassment under Title VII and the PHRA**

Title VII prohibits harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986).  To prevail on a so-called "hostile work environment" theory of sex discrimination, a plaintiff must prove (1) she suffered intentional discrimination because of her sex; (2) the discrimination was severe or pervasive; (3) she was detrimentally affected by the discrimination; (4) the detrimental effect was objectively reasonable; and (5) the existence of respondeat superior liability. *Mandel v. M & Q Packing Corp.*, 706 F.3d 157, 167 (3d Cir. 2013); *Castleberry v. STI Group*, 863 F.3d 259, 264 (3d Cir. 2017).  When brought under the PHRA, such claims are analyzed under the same framework.  *See Jones*, 796 F.3d at 327.

Although Donnelly has identified discriminatory comments based on her pregnancy and childcare responsibilities, these comments do not give rise to a hostile work environment claim. The standard for a hostile work environment claim is "demanding."  *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998).  Such claims are reserved for situations "when the workplace is permeated with discrimination, intimidation, ridicule and insult that is sufficiently severe or persuasive so as to alter the conditions of the victim's employment and create an abusive working environment."  *Id*. at 78.  Even construing the facts favorably to Donnelly, she did not face an objectively abusive working environment.  Dr. Duffy was certainly not supportive during her pregnancy.  Donnelly Dep., ECF 68-3 at 48:20-49:5.  Donnelly claims, for example, that Dr. Duffy was "purposely trying to overwhelm" her with additional work, and that he sometimes left her "really upset" and "crying."  *Id.*  Although this behavior may  "run afoul of the general civility code," such treatment by itself does not rise to the level of a hostile work environment in violation

of Title VII.  *See Yarnall v. Phila. Sch. Dist.*, 57 F. Supp. 3d 410, 433 (E.D. Pa. 2014) (Restrepo, J.) (citing *Oncale*, 523 U.S. at 80-81).  As a result, Donnelly's hostile work environment claim cannot survive summary judgment.

### C.  Disability discrimination under the ADA and the PHRA

The ADA provides that an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112.  To establish a prima facie case of discrimination under the ADA, Donnelly must show that: (1) she is a disabled person within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an adverse employment decision due to discrimination.  *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999).

For purposes of the ADA, a plaintiff is disabled if they: (1) have "a physical or mental impairment that substantially limits one or more" of their "major life activities"; (2) have "a record of such an impairment"; or (3) are "regarded as having such an impairment."  42 U.S.C. § 12102(1).  Congress passed the ADA Amendments Act of 2008 ("ADAAA") to broaden the definition of "disability" covered under the ADA, including expanding the circumstances that give rise to "regarded as" claims.  After the passage of the ADAAA, a plaintiff states a "regarded as" claim if they establish that they have been "subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment *whether or not the impairment limits or is perceived to limit a major life activity*."  *Id.* § 12102(3)(A) (emphasis added).

13

Pregnancy, absent complications, is not considered a disability under the ADA. *Spees v. James Marine, Inc.*, 617 F.3d 380, 396 (6th Cir. 2010); *Richards v. City of Topeka*, 173 F.3d 1247, 1250 n.2 (10th Cir. 1999). Donnelly's disability discrimination claims only survived dismissal under Fed. R. Civ. P. 12(b)(6) because Judge Tucker recognized that Donnelly might be able to produce evidence of "health problems surrounding the pregnancy." ECF 33 at 10.

However, that evidence did not emerge during discovery, and Donnelly's "regarded as" ADA discrimination claim cannot survive summary judgment. Although she testified in her deposition that Dr. Duffy believed she had a "mental impairment" after giving birth, Donnelly conceded that this perceived "impairment" was simply the difficulty of juggling work with childcare duties. Donnelly Dep., ECF 68-3 at 99:7-101:6. Parenting obligations do not qualify as a disability under the ADA, and Donnelly's claim therefore fails.

Similarly, Donnelly's claim for disability discrimination under the PHRA also cannot survive summary judgment. Prior to the ADAAA, the PHRA and ADA were interpreted similarly. *See Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 274 (3d Cir. 2012). Pennsylvania has not amended the PHRA to import the protections of the ADAAA, and as such pre-ADAAA standards continue to apply to discrimination claims under the state statute. *See Rocco v. Gordon Food Serv.*, 998 F. Supp. 2d 422, 428 (W.D. Pa. 2014), *aff'd*, 609 F. App'x 96 (3d Cir. 2015). Necessarily, because Donnelly's claim fails even under the more expansive ADAAA standard, her PHRA claim also fails.

**D.  FMLA interference**

When employees invoke rights granted under the FMLA, employers may not "interfere with, restrain, or deny the exercise of or attempt to exercise" these rights. 29 U.S.C. § 2615(a)(1). To assert a FMLA interference claim, a plaintiff must establish: (1) she was an eligible employee

under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) the plaintiff was entitled to FMLA leave; (4) the plaintiff gave notice to the defendant of her intention to take FMLA leave; and (5) the plaintiff was denied benefits to which she was entitled under the FMLA. *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (quoting *Ross v. Gihuly*, 755 F.3d 185, 191-92 (3d. Cir 2014)).

Unlike a FMLA retaliation claim, "[a]n interference action is not about discrimination, it is only about whether the employer provided the employee with the entitlements guaranteed by the FMLA." *Callison v. City of Phila.*, 430 F.3d 117, 120 (3d Cir. 2005).

Donnelly's interference claim fails because she cannot establish that she was denied FMLA benefits to which she was entitled.  Donnelly took two weeks of FMLA leave in March 2020, and CVS did not prevent her from taking this leave.  Donnelly Dep., ECF 68-3 at 137:24-139:10.  She claims that CVS interfered with her FMLA benefits because she may have wanted to use her remaining 10 weeks of FMLA leave at some point in the future.  Pls.' Opp. Br. at 32.  But she never requested additional FMLA leave before her termination.  Donnelly Dep., ECF 68-3 at 126:9-11.  A terminated employee cannot claim FMLA interference for leave that they never requested.  *See Capps*, 847 F.3d at 155 (stating that plaintiff must establish that they "gave notice" of their intent to take leave to claim FMLA interference).

Alternatively, Donnelly suggests that she was not properly "reinstated" after her FMLA leave ended, because she did not formally return to work before being terminated.  The applicable regulation dictates that, on return from FMLA leave, "an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment."  29 C.F.R. § 825.214.  Certainly, being furloughed upon her return is a different employment situation than when

Donnelly began her maternity leave.  But the relevant regulations further state than an employee, "has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."   29 C.F.R. § 825.216(a).  As CVS cogently points out, all employees of the company were on furlough at the time due to the Covid-19 pandemic.  CVS therefore treated her like every other employee by reinstating Donnelly as an active furloughed employee, and ultimately paying her the two weeks' Covid-19 pay.  Donnelly Dep., ECF 68-3 at 178:1-4.  Since Donnelly would have been furloughed whether she took FMLA leave or not, this argument cannot salvage her  interference claim.

**E.  Retaliation**

Donnelly asserts several claims of retaliation for asserting her rights under the FMLA, Title VII, the ADA, and the PHRA.  The prima facie case for retaliation under each of these statutes is similar. To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity; (2) her employer took adverse action against her and (3) there is a causal link between the protected activity and the adverse action.  *See Kengerski v. Harper*, 6 F.4th 531, 536 (3d Cir. 2021) (Title VII retaliation); *Krouse v. Am. Sterilizer Co*., 126 F.3d 494, 500 (3d Cir. 1997) (ADA retaliation); *Lichtenstein v. Univ. of Pittsburgh Med. Ctr*., 691 F.3d 294, 301-02 (3d Cir. 2012) (FMLA retaliation); *Jones*, 796 F.3d at 327 (3d Cir. 2015) (analyzing Title VII and PHRA claims similarly).

"[T]he timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."  *Krouse*, 126 F.3d at 503.  To use extreme examples, "[a]n inference could be drawn where two days passed between the protected activity and the alleged retaliation . . . but not where 19 months had elapsed."  *Est. of Smith v. Marasco*, 318 F.3d 497, 512-13 (3d Cir. 2003).  However, "timing plus other evidence may be an appropriate test

where the temporal proximity is not so close as to be 'unduly suggestive.'" *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 280 (3d Cir. 2000).

If the employee establishes a prima facie case of retaliation, the familiar *McDonnell Douglas* burden-shifting approach applies. *Krouse*, 126 F.3d at 500–01.

### 1. *FMLA retaliation*

Donnelly cannot establish a prima facie case of retaliation under the FMLA.[3]  CVS neither disputes that Donnelly engaged in protected activity by taking FMLA leave nor does it dispute that she suffered an adverse action when she was terminated.  But the causal link between Donnelly's FMLA leave and the adverse action is too attenuated.  Nearly three months passed after she completed her FMLA leave before CVS terminated Donnelly.  Such a temporal gap is typically insufficient to establish an FMLA retaliation claim.  *See Karaffa v. Montgomery Twp*., No. CIV.A. 12-1184, 2013 WL 1157626, at *7 (E.D. Pa. Mar. 21, 2013), *aff'd in part sub nom. Karaffa v. Twp. of Montgomery*, 560 F. App'x 133 (3d Cir. 2014) (finding that three and a half months between the end of FMLA maternity leave and alleged adverse actions was insufficient to establish retaliation claim).  CVS also did not prevent her from taking her leave, which further weighs against finding retaliation for taking FMLA leave.  Absent more substantial evidence of CVS' retaliatory motive, a three-month gap is simply too long to be "unusually suggestive" of FMLA retaliation.

---

[3] At least one case in this circuit applied a different, four-factor test for FMLA retaliation claims in a reduction-in-force/layoff context.  *See Garner v. Phila. Hous. Auth*., No. CV 15-183, 2016 WL 4430639, at *13 (E.D. Pa. Aug. 22, 2016).  Given that the Third Circuit has repeatedly endorsed the straightforward three-factor retaliation test used in *Lichtenstein* for FMLA retaliation claims, I apply that test here.  *See Budhun v. Reading Hosp. & Med. Ctr*., 765 F.3d 245, 256 (3d Cir. 2014); *Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014).  Under either test, however, Donnelly's FMLA retaliation claim does not survive summary judgment.

2.   *Title VII retaliation*

Nor can Donnelly establish a prima facie case of retaliation under Title VII.

First, Donnelly arguably engaged in protected activity.  Title VII states that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e–3(a). CVS argues Donnelly did not engage in any "protected activity" under Title VII.  Donnelly responds that both (1) taking FMLA leave and (2) threatening legal action over the Covid-19 special pay are protected activities for purposes of her claim.

Donnelly's request for FMLA leave is not enough to show that she engaged in protected activity.  District courts in this circuit disagree over whether taking FMLA maternity leave can constitute protected activity for a retaliation claim.  *Compare  Erdman v. Nationwide Ins. Co*., No. CIV.A. 1:05-CV-0944, 2010 WL 235112, at *6 (M.D. Pa. Jan. 15, 2010) (finding that seeking FMLA leave is a protected activity under the PHRA) *with McCormick v. Allegheny Valley Sch*., No. CIV. A. 06-3332, 2008 WL 355617, at *17 (E.D. Pa. Feb. 6, 2008) (finding that "a simple request for maternity leave" cannot constitute protected activity, because there is "no protest (formal or informal) of an unlawful practice").  In my view, *Barber v. CSX Distrib. Servs.,* 68 F.3d 694, (3d Cir. 1995) answers this question.  There, in the context of the ADEA, the Third Circuit held that "a person has engaged in 'protected conduct'" when they have opposed any practice made unlawful by a federal anti-discrimination statute.  *Id*. at 702.  In applying for leave, Donnelly was seeking a statutory benefit, not protesting, or objecting to any unlawful practice on the part of CVS.  By definition, until CVS responded to her request, there was no action on its part that she *could* protest.  I therefore have no hesitation in concluding  that a request for maternity leave in

18

itself cannot fall within the definition of protected activity under the statute.  *See* 42 U.S.C. § 2000e–3(a).

In contrast, Donnelly's complaint over her Covid-19 pay does constitute protected activity. Opposition to an unlawful employment practice, such as denying a benefit to someone because they were on maternity leave, is squarely a "protected activity" under Title VII.  There is some factual dispute over whether Donnelly threatened legal action which resulted in her being reinstated and receiving her Covid-19 special pay.  Donnelly Dep., ECF 68-3 at 177:10-178:9.  But assuming that she did, her opposition to a potentially unlawful action by CVS would be protected.

Nevertheless, the causal link remains too attenuated to establish a prima facie case of retaliation.  Donnelly's termination came three months after her leave ended, and three months after she threatened legal action.  She also admits that her termination would have likely occurred regardless of whether she raised concern over the Covid-19 pay.  *Id.* at 249:18-250:14.  Donnelly has therefore failed to establish a causal link between her protected activity and her termination.

### 3.  ADA retaliation

Donnelly cannot claim ADA retaliation in the absence of her having engaged in ADA-protected activity.  She is correct that requesting medical leave is a request for an accommodation under the ADA, but only to the extent that the accommodation arises from a condition covered by the ADA.  *See, e.g*., *Mascioli v. Arby's Rest. Grp., Inc*., 610 F. Supp. 2d 419, 448 (W.D. Pa. 2009) (epilepsy treatment); *Shannon v. City of Phila.*, No. Civ.A.98–5277, 1999 WL 1065210, at *5 (E.D. Pa. Nov. 23, 1999) (major depression).  As noted above, pregnancy without complications is not a disability for purposes of the ADA.  Consequently, Donnelly cannot establish that she engaged in protected activity under the ADA.

**F. CVS is not entitled to summary judgment on the issue of punitive damages.**

CVS also moves for summary judgment on Donnelly's request for punitive damages.[4] Under Title VII, a plaintiff is allowed to seek punitive damages if they demonstrate that the employer acted :with malice or reckless indifference to the plaintiff's federally protected rights." 42 U.S.C. §§ 1981a(a)(1), (b)(1). "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999). Certain instances of intentional discrimination do not "give rise to punitive damages liability under this standard," including circumstances where the employer is unaware of the relevant federal law, where the employer believes its discrimination is lawful, or where a plaintiff asserts a novel theory of discrimination. *Id.* at 536-37. In contrast, if an employer discriminates "in the face of a perceived risk that its actions will violate federal law," it may be liable for punitive damages. *Id.* at 536.[5]

Here, CVS is correct that there is minimal evidence in the record regarding Dr. Duffy's awareness that he was violating the law. *See* Def.'s Br., ECF 64 at 51. Nonetheless, Plaintiff has demonstrated that Dr. Duffy was faced with a clear choice – recommend that CVS terminate either

---

[4] Only the Title VII claim services, and Donnelly concedes that she cannot seek punitive damages under the PHRA based on current case law.

[5] The Supreme Court in *Kolstad* asserted that this standard is consistent with the common law, and noted its assumption that "Congress, in legislating on punitive awards, imported common law principles governing this form of relief." *See* 527 U.S. 526 at 537-39. The Court simultaneously maintained there is no "egregiousness" requirement for punitive damages at common law. *Id.* at 539. *Kolstad's* description of the common law standard is less than convincing, as courts often require a finding of egregious misconduct before imposing punitive damages, and as such the "reckless indifference" portion of the statutory standard for punitive damages under Title VII seems less demanding than at common law. *See, e.g.*, *G.J.D. by G.J.D. v. Johnson*, 713 A.2d 1127, 1129 (Pa. 1998) (noting that under Pennsylvania law, "the function of punitive damages is to deter and punish egregious behavior").

Donnelly or King – and chose Donnelly, who was recently pregnant.  Given the other evidence in the case about the allegedly discriminatory treatment that Donnelly experienced from Dr. Duffy during her pregnancy, I cannot say definitively that there is no basis on which the jury could award punitive  damages.  Depending on how the evidence unfolds, Donnelly could plausibly satisfy the controlling standard.  I therefore consider it more prudent to defer ruling until the record is developed at trial.  *See Pichler v. UNITE,* 542 F.3d 380, 390 (3d Cir. 2008) (holding that issue of "willfulness or recklessness of a defendant's conduct" under a  different federal statute required trial by jury).

**IV.    Conclusion**

For the reasons set forth above, Defendant's Motion for Summary Judgment will be denied as to Plaintiff's claim of pregnancy discrimination in violation of Title VII and the PHRA, and as to the issue of punitive damages.   For all other claims, summary judgment will be granted.  An appropriate order follows.

_____/s/ Gerald Austin McHugh_____
United States District Judge

21